PATTERSON, et al. *v.* HARRIS

No. 41624          December 19, 1960          125 So. 2d 545

*Lipscomb & Barksdale, Wells, Thomas & Wells,* Jackson, for appellants.

*Jack M. Greaves,* Canton, for appellee.

KYLE, J.

This case is before us on appeal by Louis L. Patterson, Jr., and others from a decree of the Chancery Court of Madison County enjoining the appellants and each of them from interfering with the appellee's use of any easement for roadway purposes claimed by the appellee across the appellants' lands situated in Madison County.

The amended bill of complaint in this cause was filed by Edward Harris, as complainant, on September 29, 1959, against Louis L. Patterson, Jr., Thomas A. Patterson, Garner Lester and H. H. Harlow, as defendants, seeking to establish the complainant's right to a perma-

nent easement of passage or roadway over and across lands owned by the said Louis L. Patterson, Jr., and Thomas A. Patterson, as devisees under the will of Mrs. Elizabeth Atkinson Miller, deceased, and described as the NE¼ of the SE¼ and the SE¼ of the SE¼ of Section 22, Township 7, Range 1 East, in Madison County, which said lands were in the possession of the said Garner Lester as lessee, and seeking a mandatory injunction commanding the defendants to cease and desist from locking the gate on said roadway and interfering with the complainant's use of said roadway as a means of ingress and egress into and from a 40-acre tract of land lying immediately north of the defendants' lands, and described as the SE¼ of the NE¼ of said Section 22, which said 40-acre tract of land was owned by the complainant's father, Andrew Harris, at the time of his death in 1956.

The complainant alleged in his bill of complaint that he was a part owner of the said SE¼ of the NE¼ of said Section 22, as one of the heirs of the said Andrew Harris, deceased, and that he was in possession of said land and was using the same for the grazing of cattle; that there was a roadway leading from the complainant's land southwardly through the said NE¼ of the SE¼ and the SE¼ of the SE¼ of said Section 22 to a public road; that said roadway had been in constant use by the complainant and his predecessors in title for a period of fifty years; and that complainant had acquired a permanent right of passage over said roadway to and from his land in said SE¼ of said NE¼ of said Section 22. The complainant further alleged that said roadway was essential to his continued occupancy and use of his said 40-acre tract, as a means of ingress and egress to and from said land, and the only way available for him to reach the public highway; that the said Louis L. Patterson, Jr., and Thomas A. Patterson, present owners of the lands through which said roadway ran, and the said Garner Lester, lessee, and his manager,

the said H. H. Harlow, had placed a lock on the gate at the entrance into said roadway and had refused to allow the complainant to use said roadway and had served notice on the complainant not to cross over the lands owned by the said Louis L. Patterson, Jr., and the said Thomas A. Patterson, which were under lease to the said Garner Lester. The complainant alleged that he had acquired a permanent easement or right of passage over said land by constant use of said roadway for a period of more than ten years, and that he was entitled to have issued an injunction against the defendants as prayed for in said bill of complaint.

The defendants in their answer denied that there was a roadway leading from the Andrew Harris 40-acre tract southwardly through and across the lands leased to Garner Lester; and the defendants denied that the alleged roadway had been in constant use by the complainant and his predecessors in title for a period of fifty years. The defendants denied that the complainant was entitled to a right of passage over the defendants' land, or to have a permanent injunction issued as prayed for in the bill of complaint. The defendants admitted that the complainant's father, Andrew Harris, and the complainant had used the former roadway running southwardly across the Miller Estate land in the SE¼ of said Section 22 during the lifetime of Mrs. Elizabeth Atkinson Miller; but the defendants averred that such use as was made of said roadway by the said Andrew Harris and the complainant during the lifetime of the said Mrs. Elizabeth Atkinson Miller was made with the permission of the owner of said land, and that such permission had been lawfully revoked. The defendants further averred in their answer that the said Andrew Harris had acquired title to the said SE¼ of the NE¼ of said Section 22 by warranty deed from one William Rouser, who owned other lands lying north of the Miller Estate land and adjoining the said 40-acre tract and who was legally obligated to furnish the complainant

with means of ingress and egress into and from said 40-acre tract, and that there was a road leading from the complainant's land over and across the lands owned by the said William Rouser to a public highway, which would have afforded adequate passageway for the complainant had he desired to use it.

There is no substantial conflict in the testimony of the witnesses in the case. The testimony shows that Mrs. Elizabeth Atkinson Miller was the owner of the land through which the alleged roadway runs during her lifetime and at the time of her death in December 1958; and that the defendants Louis L. Patterson, Jr., and Thomas A. Patterson acquired title to said land, along with other lands, as devisees under her last will and testament; that the defendant Garner Lester had been in possession of said lands for a period of several years as lessee; and that said lands were being used for the pasturage of a large number of cattle. The testimony shows that Andrew Harris purchased the above mentioned 40-acre tract of land adjoining the Miller Estate lands in 1927 or 1928 from William Rouser, who at that time owned other lands lying immediately north of the lands owned by Mrs. Miller; that Andrew was a tenant on the Miller land at the time he purchased said 40-acre tract; that he built a house on the 40-acre tract in the year 1929 and moved his family into the house soon thereafter; and that Andrew and other members of his family made use of a passageway through the Miller woods and the farm roadway running southwardly across the open land as an outlet to the public highway until Andrew's death in 1956.

The complainant, Edward Harris, testified that he had been in possession of the 40-acre tract of land since the death of his father; that he was grazing cattle on the land; and that no part of the land was being cultivated. Edward testified that his father and other members of the family had used the roadway running southwardly from the Harris 40-acre tract to the public high-

way since his father built the house on the 40-acre tract in 1929; that no one gave them permission to use the roadway, but Mrs. Miller knew that they were crossing over her land and she never objected; that no one ever told them not to cross the Miller land until after Mrs. Miller's death, when Mr. Patterson wrote a letter to Mr. Otto Thompson, who held a lease on 173½ acres of the Miller Estate lands, instructing him not to permit Edward to cross over the land. Edward stated that the roadway which the Harris family used ran southwardly over that part of the Miller Estate land which Mrs. Miller had leased to Mr. Lester; that after Mr. Lester placed a lock on the gate, sometime during the year 1958, Mr. Lester's manager gave him a key to the lock on the gate, but later demanded that the key be returned to him; and that for a short time thereafter he used a roadway along the west side of the land which had been leased to Mr. Thompson. Edward stated that it was only after Mr. Thompson had notified him that he would no longer be permitted to cross over the Miller Estate land that he filed his bill of complaint seeking to establish his right of passage over the land described in the bill of complaint. Edward stated that there was no passable roadway leading from his property through the William Rouser property to a public road. On cross-examination however, Edward admitted that Lee Sammy Jones lived in a house on the 40 acres of the William Rouser land lying north of the Harris 40-acre tract, and that Lee Sammy Jones and other tenants who lived on the Rouser land had outlets over farm roads to a public road running northwardly by Ridley Hill. But Edward stated that the road through the Rouser land was not an improved road, and that it was more convenient for him to cross over the Miller Estate land than it would be to cross over the Rouser land.

George Harris, a brother of Andrew Harris, testified that he had rented land from Mrs. Miller for a period of many years; that his brothers, Joel and Andrew Har-

ris, both lived on the Miller place at one time and paid rent to Mrs. Miller; that Andrew was living on the Miller place when he bought the 40-acre tract from William Rouser; that he and other members of the Harris family used the roadway running northwardly through the Miller land to Andrew's house—just anybody going to Andrew's house used the road; and that Mrs. Miller never objected to anybody going through there. George stated they could always travel the old road through the woods. Willis Murrell testified that he had been a tenant on Mrs. Miller's place for a long time; that he used the road himself, and no one had ever given him permission to use the road. On cross-examination Willis admitted that there was a road leading out north from Lee Sammy Jones' house on the Rouser land, but he stated that it was pretty rugged through there.

Garner Lester, who was called to testify as a witness on behalf of the defendants, testified that he had been in possession of several hundred acres of the Miller Estate land as lessee for the last eight or ten years; that he and Mrs. Miller rode over the lands in an automobile or truck at the time the lease contract was entered into, and that he asked Mrs. Miller what special arrangements she had with the tenants, as he was going to do some fencing. Lester stated that Mrs. Miller told him that the tenants' leases were from year to year, and that it would be all right for him to build some fences. She told him that she had a colored cemetery at one end of the place, and that Edward Harris, who had formerly lived on the place, had tract of land lying along the north side of her property and had been using a road through there; that he was the son of a tenant of long standing, that they had owned the property for some years, and she felt like "they kind of belonged to her", and that she hoped that Lester would be good to them like she had tried to be. Lester stated that, when they came to a gap leading into the 40-acre

tract, he asked her about the gap, and she said, "That leads into the property Andrew Harris has. * * * I have been letting them go through there because they were raised on the farm."

Lester stated that he began to fence the lands soon after he obtained the lease, in order to put cattle on the place. He found that fencing the property did not keep out trespassers; that rabbit and bird hunters would come in anyway; and he found that some one was cutting firewood and taking it to Jackson to sell. Finally, he put a lock on the gate, and after the lock was put on the gate Edward Harris called him on the telephone and wanted to go through. He told Edward to see his manager, Mr. Harlow, and Mr. Harlow let Edward have a key. Edward later got stuck in the mud with a load of cattle or feed on a part of the land which had been sown in rye grass and oats, and had to get a tractor to pull him out. Considerable damage was done by the bogging down of the truck or tractor; and after that Harlow left word for Edward to return the key to him, and Lester then wrote Edward a letter in which he stated that he had cattle on the land and it was best for him to use some other route to go to his property. The letter was dated February 24, 1958, and a copy of the letter appears to have been sent to Mrs. Miller. Lester stated that only a part of the plantation road through the Miller Estate property over which Edward Harris was claiming a right of passage was still in use; that the open land lying north of the tenant house formerly occupied by Joel Harris as a tenant had been plowed up and converted into a winter pasture several years before the date of the trial.

Walter Lewis testified that he had been a tenant on Mrs. Miller's place and that he was still living on the place at the time of the trial; and that he knew Andrew Harris. He stated that when Andrew purchased the 40-acre tract lying north of the Miller land, he said to him, "Man, why did you go back way in there, and no way

out?'' And Andrew said to him: ''There is a way out on the north end here, But I use this south end for a near way to the church and out through by my brother's.'' Walter stated that Andrew told him that he was going to use the roadway down through the Miller property ''as long as Miss Lizzie let him use it.'' Andrew was a tenant on Mrs. Miller's place at that time. Louis L. Patterson, Jr., testified that Mrs. Miller had allowed the members of the Harris family permission to pass over her land and use the farm roadway because their relatives all lived on the place and were farming there; and that Mrs. Miller in January or February 1958 discussed with him the fact that she and Mr. Lester were going to have to deny permission to members of the Harris family to pass over her land because of trespasses and damage to the property, and that Mrs. Miller had Mr. Lester write a letter to that effect to Edward Harris.

The chancellor found that Andrew Harris was a tenant on Mrs. Miller's property at the time he purchased the 40-acre tract of land lying north of the Miller property from William Rouser and constructed the dwelling house on the 40-acre tract; that Andrew moved on the 40-acre tract in 1929, and began to use and continued to use the roadway running south across the Miller land to the highway until his death in 1956; and that Edward had continued to use the roadway from the date of his father's death until he was stopped from using it by the defendants approximately a year and a half before the date of the trial. The chancellor found that, at the time Andrew Harris and Edward Harris began to use the roadway, there was no express permission granted by Mrs. Miller to make use of the roadway, and there was no interference with such use during that period of time. The chancellor was of the opinion that the use of the roadway by Andrew Harris and the complainant was such as to vest in the complainant a right of user of the roadway, and that the complainant was

entitled to an injunction prohibiting the defendants from obstructing him in his right to use the roadway. The chancellor found that the defendants had a right to maintain gates across the roadway, however, and that the defendant should be allowed to put locks on the gates, provided that they furnished a key to the complainant so that he might go to and come from his property when he wished to do so; and a decree was entered in accordance with those findings.

The appellants have assigned and argued only one point as ground for reversal of the decree of the lower court and that is, that the court erred in its holding that the appellee had acquired an easement of passage over the appellants' land, and in granting a permanent injunction to the appellee prohibiting the appellants from obstructing the appellee's use of said roadway; and the appellants argue in support of said assignment of error that the use of their land for roadway purposes by the appellee, as shown by the evidence, was a permissive use and at no time adverse to the owner of the real title or a use under a claim of right.

■■ ■ There is no substantial conflict in the testimony of the witnesses; and in our opinion the evidence in the case, taken in the light most favorable to the complainant, merely shows a permissive use rather than an adverse use of the roadway in question by Andrew Harris during his lifetime and by the appellee after Andrew's death. Andrew and the other members of his family were tenants on Mrs. Miller's plantation at the time Andrew acquired title to the adjoining 40-acre tract, and after Andrew moved on the 40-acre tract in 1929 two of his brothers continued to live on the Miller property. The roadway across the Miller property which Andrew and other members of his family used ran southwardly for a distance of several hundred feet through a thickly wooded stretch of uncultivated land to the point of intersection with a plantation road run-

ning southwardly to the public highway. The house which Andrew's brother Joel occupied was located near the north end of the plantation road. It was shown by the testimony of several witnesses that Mrs. Miller knew that Andrew and other members of his family were using the roadway through the Miller woods and out to the public road, and that Mrs. Miller never objected to their using the road because they had been raised on her farm. There is no evidence in the record which indicates that the use of the roadway by Andrew and other members of his family was adverse to the owner of the real title to the land or a use under a claim of right.

██ A use that has its inception in the permission of the owner will continue as such until a distinct and positive assertion of a right hostile to the owner is brought home to him by words or acts. LaRue v. Kosich, 66 Ariz. 299, 187 P. 2d 642.

"Adverse use is requisite to the acquisition of an easement by prescription. Therefore, the rule is well settled that use by express or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription, since adverse user, as distinguished from permissive user, is lacking." 17A Am. Jur., Easements, par. 86. To transform a permissive use into an adverse one there must be (1) a distinct and positive assertion of a right hostile to the rights of the owner, which is brought to his attention, or (2) a change in the character of the use. 17A Am. Jur., 703 Easements, par. 88.

In the case of Weaver v. Pitts (1926), 191 N.C. 747, 133 S.E. 2, the Court said: "The law should, and does, encourage acts of neighborly courtesy. A landowner who quietly acquiesces in the use of a path, or road, across his uncultivated land, resulting in no injury to him, but in great convenience to his neighbor, ought not to be held to have thereby lost his rights. It is only when the use of the path or road is clearly adverse to the owner of

the land, and not an enjoyment of neighborly courtesy, that the landowner is called upon 'to go to law' to protect his rights.''

■■ ■ It is a recognized rule of law that where the use of a private way by a neighbor is by the expressed or implied permission of the owner, the continued use is not adverse and cannot ripen into a prescriptive right. LaRue v. Kosich, 66 Ariz. 299, 187 P. 2d 642; Pacific Gas & Electric Co. v. Crockett etc. Co., 70 Cal. App. 283, 233 P. 370; Trump v. McDonnell (1897), 120 Ala. 200, 24 So. 353; Weaver v. Pitts, (1926), 191 N.C. 746, 133 S.E. 2; Boullioun v. Constantine (1932), 186 Ark. 625, 54 S.W. 2d 986; Thomas v. Morgan, 113 Okla. 212, 240 P. 735, 43 A.L.R. 934; Friend v. Holcombe, 196 Okla. 111, 162 P. 2d 1008.

The rule thus stated has been recognized by our own Court in the following cases: Alexander v. Polk, 39 Miss. 737; Lanier v. Booth, 50 Miss. 410; Warren County et al. v. Mastronardi, 76 Miss. 273, 24 So. 199; Wills v. Reed, 86 Miss. 446, 38 So. 793; Dead River Fishing & Hunting Club v. Stovall, 147 Miss. 385, 113 So. 336.

In the case of Dead River Fishing & Hunting Club v. Stovall, supra, the Court held that title by adverse possession, whether to land or an easement, can be acquired only by possession adversely held and asserted for a period of ten years. In that case the Court quoted with approval the following statement from Alexander v. Polk, supra:

''The possession which is relied on to defeat a conveyance by the real owner must be adverse; that is, it must be openly and notoriously in defiance of the actual title, and such as converts the estate into a mere right of entry or action; to effect which, nothing short of ouster or disseisin will serve. Zellers, Lessee, v. Eckert, 4 How. U.S.R. 289, 11 L. Ed. 979. The term 'adverse possession' designates a possession in opposition to the true title and real owner, and it implies that it commenced in

wrong—by ouster or disseisin—and is maintained against right. The law, on the contrary, presumes that every possession is rightful and consistent with, not in opposition or 'adverse' to, title and ownership. A party, therefore, who relies upon 'adverse possession,' in order to rebut this presumption of possession consistent with the title of the real owner, must prove his possession to be 'adverse' to the title set up, Jackson v. Sharp, 9 Johns. (N.Y.) 163 (6 Am. Dec. 267); Ld Raym, 329; that is, he must show the actual knowledge of the real owner that he claims in opposition to, and definance of, his title, or he must show such an occupancy and user, so open and notorious, and inconsistent with, as well as injurious to, the rights of the true owner, that the law will authorize, from such facts, the presumption of such knowledge by the true owner. It is not the mere occupancy or possession which must be known to the true owner, to prejudice his rights; but its 'adverse' character.''

The appellee's attorney cites in support of the decree of the lower court the case of Lindsey v. Shaw, et ux., 210 Miss. 333, 49 So. 2d 580. But the opinion in that case, we think, is not controlling here. The opinion shows that the passageway in controversy in that case was ''a recognized old settlement road'' which led from the appellant's home to the public highway, and which the appellant had used for the past 30 or 35 years without question or interference. The opinion also states that ''there was no other available route over which the appellant could reach a public highway.'' It was not shown in that case that the appellant's use of the roadway was permissive in its inception, and the question of the adversity of the appellant's use of the roadway was not discussed in the opinion rendered by the court. We have no such state of facts in this case. On the contrary, the proof in this case, we think, clearly shows that the use of the roadway across the Miller land by Andrew Harris

and other members of his family, after they moved off the Miller place in 1929, was in its inception a permissive use, and was so understood by Andrew and the other members of his family, and such use continued to be permissive until notice of the revocation of such permission was given to the appellee in 1958.

The appellee has filed a cross-assignment of errors in which he challenges the validity of that part of the decree appealed from which authorized the appellants to lock the gates which had been placed across the entrance into the roadway in controversy and which required the appellants to furnish the appellee with a key to each gate, subject to the conditions set forth in the decree. But in view of the decision which we have rendered on the main issue presented by the appellants' direct appeal, it is not necessary that we consider the appellee's cross-assignment of errors.

The appellee, in our opinion, failed to establish a right of way by prescription, based upon an adverse user of the roadway for the statutory period of ten years; and for the reasons stated above the decree of the lower court is reversed, and a judgment will be rendered by this Court dismissing the appellee's bill of complaint.

Reversed and judgment rendered here for appellants.

*Hall, P.J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.